## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

**DEBBIE S.,**

    **Plaintiff,**

**v.**

**KILOLO KIJAKAZI,** *Acting Commissioner, Social Security Administration,*[1]

    **Defendant.**

**CIVIL ACTION FILE**

**NO. 1:20-cv-1963-AJB**

## ORDER AND OPINION[2]

Plaintiff Debbie S. brought this action pursuant to § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to obtain judicial review of the final decision of the Commissioner of the Social Security Administration ("the Commissioner") denying her application for social security disability insurance benefits ("DIB")

---

[1]    Kilolo Kijakazi is now the Acting Commissioner of the Social Security Administration.  Under the Federal Rules of Civil Procedure, Kijakazi "is automatically substituted as a party."  Fed. R. Civ. P. 25(d).  The Clerk is hereby **DIRECTED** to amend the case style to reflect the substitution.

[2]    The parties have consented to the exercise of jurisdiction by the undersigned pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure.  (*See* Dkt. Entries dated 11/10/2020 & 11/12/2020).  Therefore, this Order constitutes a final Order of the Court.

under the Social Security Act.[3]  For the reasons set forth below, the Court **REVERSES** the final decision of the Commissioner **AND REMANDS** the case to the Commissioner for further proceedings consistent with this opinion.

## I.   PROCEDURAL HISTORY

Plaintiff filed an application for DIB on December 14, 2016, alleging disability commencing on December 12, 2016.  [Record (hereinafter "R") 124, 246-52].  Plaintiff's application was denied initially and on reconsideration.  [R116-36].  Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ").  [R149-52].  An evidentiary hearing was held on March 5, 2019,

---

[3]      Title II of the Social Security Act provides for federal DIB. 42 U.S.C. § 401 et seq.  Title XVI of the Social Security Act, 42 U.S.C. § 1381, et seq., provides for Supplemental Security Income Benefits for the disabled ("SSI").  Unlike DIB claims, SSI claims are not tied to the attainment of a particular period of insurance eligibility.  *Baxter v. Schweiker*, 538 F. Supp. 343, 350 (N.D. Ga. 1982).  Otherwise, the relevant law and regulations governing the determination of disability under a claim for DIB are nearly identical to those governing the determination under a claim for SSI.  *Wind v. Barnhart*, 133 Fed. Appx. 684, 690 n.4 (11th Cir. June 2, 2005) (citing *McDaniel v. Bowen*, 800 F.2d 1026, 1031 n.4 (11th Cir. 1986)).  Thus, in general, the legal standards to be applied are the same regardless of whether a claimant seeks DIB, to establish a "period of disability," or to recover SSI, although different statutes and regulations apply to each type of claim.  *See* 42 U.S.C. § 1383(c)(3) (establishing that the judicial provisions of 42 U.S.C. § 405(g) are fully applicable to claims for SSI).  Therefore, to the extent that the Court cites to SSI cases, statutes, or regulations, they are equally applicable to Plaintiff's DIB claims.

[R80-115], at which Plaintiff amended her alleged onset date to December 7, 2017, [R86]. The ALJ issued a decision on April 9, 2019, denying Plaintiff's application on the ground that she had not been under a "disability" at any time from the amended onset date through the date of the decision. [R66, 72]. Plaintiff sought review by the Appeals Council, and the Appeals Council denied Plaintiff's request for review on March 16, 2020, making the ALJ's decision the final decision of the Commissioner. [R1-9].

Plaintiff then filed an action in this Court on May 7, 2020, seeking review of the Commissioner's decision. [Doc. 1]. The answer and transcript were filed on October 7, 2020. [Docs. 12, 13]. On May 3, 2021, Plaintiff filed a brief in support of her petition for review of the Commissioner's decision, [Doc. 24]; on June 2, 2021, the Commissioner filed a response in support of the decision, [Doc. 25]; and on June 23, 2021, Plaintiff filed a reply brief in support of her petition for review of the Commissioner's decision, [Doc. 27].[4] The matter is

---

[4]      Plaintiff's briefs were timely and within the allowable number of pages, per extensions granted by the Court. However, the Court did not excuse Plaintiff from compliance with Local Rule 5.1, which governs font selection and size, line spacing, margins, and the like. *See* LR 5.1(C), (D), NDGa. While the Court will not sanction Plaintiff, it does advise Plaintiff's counsel that violation of its font and margin standards in future cases may result in sanctions, up to and including the striking of briefs.

now before the Court upon the administrative record, the parties' pleadings, and the parties' briefs, [5] and it is accordingly ripe for review pursuant to 42 U.S.C. § 405(g).

## II.   <u>STANDARD FOR DETERMINING DISABILITY</u>

An individual is considered disabled for purposes of disability benefits if he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The impairment or impairments must result from anatomical, psychological, or physiological abnormalities which are demonstrable by medically accepted clinical or laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do previous work but cannot, considering age, education, and work experience, engage in any other kind of substantial gainful work that exists in the national economy.  42 U.S.C. § 423(d)(2)-(3).

The burden of proof in a Social Security disability case is divided between the claimant and the Commissioner.  The claimant bears the primary burden of

---

[5]   Neither party requested oral argument.  (*See* Dkt.).

establishing the existence of a "disability" and therefore entitlement to disability benefits. 20 C.F.R. § 404.1512(a). The Commissioner uses a five-step sequential process to determine whether the claimant has met the burden of proving disability. 20 C.F.R. § 404.1520(a); *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001); *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999), *superseded by* Social Security Ruling ("SSR") 00-4p, 2000 WL 1898704 (Dec. 4, 2000),[6] *on other grounds as stated in Washington v. Comm'r of Soc. Sec.*, 906 F.3d 1353, 1360-61 (11th Cir. 2018). The claimant must prove at step one that he is not undertaking substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). At

---

[6]     Social Security Rulings are published under the authority of the Commissioner of Social Security and are binding on all components of the administrative process. *Sullivan v. Zebley*, 493 U.S. 521, 530 n.9 (1990), *superseded by statute on other grounds as stated in Colon v. Apfel*, 133 F. Supp. 2d 330, 338-39 (S.D.N.Y. 2001); *Tauber v. Barnhart*, 438 F. Supp. 2d 1366, 1377 n.6 (N.D. Ga. 2006) (Story, J.) (citing 20 C.F.R. § 402.35(b)(1)). Although SSRs do not have the force of law, they are entitled to deference so long as they are consistent with the Social Security Act and regulations. *Massachi v. Astrue*, 486 F.3d 1149, 1152 n.6 (9th Cir. 2007); *Salamalekis v. Comm'r of Soc. Sec.*, 221 F.3d 828, 832 (6th Cir. 2000) ("If a Social Security Ruling presents a reasonable construction of an ambiguous provision of the Act or the agency's regulations, we usually defer to the SSR."); *Minnesota v. Apfel*, 151 F.3d 742, 748 (8th Cir. 1998) ("Social Security Rulings, although entitled to deference, are not binding or conclusive."); *Pass v. Chater*, 65 F.3d 1200, 1204 n.3 (4th Cir. 1995); *Gordon v. Shalala*, 55 F.3d 101, 105 (2d Cir. 1995); *Andrade v. Sec'y of Health and Human Servs.*, 985 F.2d 1045, 1051 (10th Cir. 1993).

step two, the claimant must prove that he is suffering from a severe impairment or combination of impairments that significantly limits his ability to perform basic work-related activities.   20 C.F.R. § 404.1520(a)(4)(ii).   At step three, if the impairment meets one of the listed impairments in Appendix 1 to Subpart P of Part 404 (Listing of Impairments), the claimant will be considered disabled without consideration of age, education, and work experience. 20 C.F.R. § 404.1520(a)(4)(iii).   At step four, if the claimant is unable to prove the existence of a listed impairment, he must prove that his impairment prevents performance of past relevant work.   20 C.F.R. § 404.1520(a)(4)(iv).   At step five, the regulations direct the Commissioner to consider the claimant's residual functional capacity ("RFC"), age, education, and past work experience to determine whether the claimant can perform other work besides past relevant work.   20 C.F.R. § 404.1520(a)(4)(v).   The Commissioner must produce evidence that there is other work available in the national economy that the claimant has the capacity to perform.   *Doughty*, 245 F.3d at 1278 n.2.   To be considered disabled, the claimant must prove an inability to perform the jobs that the Commissioner lists.   *Id*.

If at any step in the sequence a claimant can be found disabled or not disabled, the sequential evaluation ceases and further inquiry ends.

6

20 C.F.R. § 404.1520(a)(4).   Despite the shifting of burdens at step five, the overall burden rests on the claimant to prove that he is unable to engage in any substantial gainful activity that exists in the national economy.   *Doughty*, 245 F.3d at 1278 n.2; *Boyd v. Heckler*, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds by* 42 U.S.C. § 423(d)(5), *as recognized in Elam v. R.R. Ret. Bd*., 921 F.2d 1210, 1214 (11th Cir. 1991).

## III.   SCOPE OF JUDICIAL REVIEW

A limited scope of judicial review applies to a denial of Social Security benefits by the Commissioner.   Judicial review of the administrative decision addresses three questions:   (1) whether the proper legal standards were applied; (2) whether there was substantial evidence to support the findings of fact; and (3) whether the findings of fact resolved the crucial issues. *Washington v. Astrue*, 558 F. Supp. 2d 1287, 1296 (N.D. Ga. 2008); *Fields v. Harris*, 498 F. Supp. 478, 488 (N.D. Ga. 1980).   This Court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.   *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005).   If substantial evidence supports the Commissioner's factual findings and the Commissioner applies the proper legal standards, the Commissioner's findings are conclusive.   *Lewis v. Callahan*, 125 F.3d 1436, 1439-40 (11th Cir. 1997); *Barnes v. Sullivan*, 932 F.2d 1356, 1358

(11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987) (per curiam); *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986) (per curiam); *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).

"Substantial evidence" means "more than a scintilla, but less than a preponderance." *Bloodsworth*, 703 F.2d at 1239. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion, and it must be enough to justify a refusal to direct a verdict were the case before a jury. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Hillsman*, 804 F.2d at 1180; *Bloodsworth*, 703 F.2d at 1239. "In determining whether substantial evidence exists, [the Court] must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [Commissioner's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986) (per curiam). Even where there is substantial evidence to the contrary of the ALJ's findings, the ALJ decision will not be overturned where "there is substantially supportive evidence" of the ALJ's decision. *Barron v. Sullivan*, 924 F.2d 227, 230 (11th Cir. 1991). In contrast, review of the ALJ's application of legal principles is plenary. *Foote v. Chater*, 67 F.3d 1553, 1558 (11th Cir. 1995); *Walker*, 826 F.2d at 999.

Also, a "court must consider evidence not submitted to the [ALJ] but considered by the Appeals Council when that court reviews the Commissioner's final decision." *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1258 (11ᵗʰ Cir. 2007).  In reviewing this additional evidence, the court must evaluate whether this "new evidence renders the denial of benefits erroneous." *Id*. at 1262. This means that the court must "determine whether the Appeals Council correctly decided that the '[ALJ's] action, findings, or conclusion is [not] contrary to the weight of the evidence currently of record.' " *Id*. at 1266-67 (quoting 20 C.F.R. § 404.970(b)).

## IV.   STATEMENT OF FACTS[7]

### A.   Background

Plaintiff was born in 1960 and was fifty-eight years old on the date of the ALJ's decision.  [R62, 84, 116, 246, 285].  She had a bachelor's degree and had worked   as   a   volunteer   coordinator,   recreational   leader,   customer-service

---

[7]      In general, the records referenced in this section are limited to those deemed by the parties to be relevant to this appeal.  [*See* Docs. 24, 25, 27; *see also* Doc. 14 (Sched. Ord.) at 3 ("The issues before the Court are limited to the issues properly raised in the briefs.")].  The contentions are credited only to the extent that they are supported by specific record citations, however. [*See* Doc. 14 at 3 ("Each contention must be supported by specific reference to the portion of the record relied upon.")].

representative, and social-services aide.  [R84, 87-90, 107-09, 290, 356].  Plaintiff alleged that she was disabled due to knee and back disorders, hypertension, high blood pressure, pain, and sleep disorders.  [R289, 296, 323].

### B.   Lay Testimony

In the hearing before the ALJ, Plaintiff testified that in March 2018 she underwent a trial for a stimulus implant in her back because of a degenerative spine and that in June 2018 she had surgery to permanently implant a spinal-cord stimulator.[8]  [R91].  She stated that two discs had become degenerative and that she had a lumbar fusion in 2009.  [R91].  She reported that she was told in 2017 that she would eventually need to have another lumbar fusion but that because the surgeon would need to go through the left side of her stomach to get to her spine to avoid existing scar tissue, her doctor decided to see if she qualified for pain management.  [R91-92].  She indicated that her pain level stays at about seven on a ten-point scale.  [R92].

---

[8]     A spinal-cord stimulator is a device that is surgically implanted to block nerve activity to minimize the sensation of chronic back pain reaching the brain.  A trial electrode is first inserted to see if it helps with pain.  If the treatment greatly reduces pain, a permanent generator may later be implanted under the skin.  MedlinePlus, *Spinal Cord Stimulation*, https://medlineplus.gov/ency/article/007560.htm (last visited 9/10/2021).

Plaintiff additionally reported that she had a right-hip replacement in 2016 and a right-knee replacement on December 19, 2018. [R96-97]. She testified that her doctor had originally recommended replacing the left knee first but that they had together decided to start with the right knee because it gave her more discomfort. [R92]. She stated that she also needed a left-knee replacement but wanted to wait because her right knee was still so uncomfortable. [R92, 96-97].

Plaintiff also indicated that she has chronic venous reflux in the veins in her legs, which gives her the feeling of restless legs. [R98]. She stated that Dr. Charles Ross at Piedmont provided injection treatment in both legs and recommended that she wear compression hose, exercise her calf muscles throughout the day, and elevate her legs three times per day, but she indicated that she could not comply as to her right leg because her knee replacement was still too uncomfortable. [R98-99].

Plaintiff testified to using a cane prior to the knee replacement due to inflammation, trouble walking, and difficulty getting in and out of the car. [R97, 105]. She thought the discomfort was from sciatica, but a doctor diagnosed venous reflux. [R105]. She stated that she needed both hands and two railings to go up and down stairs and that her husband installed a railing on the left side of the staircase so she could hold onto rails with both hands. [R101-02]. She

testified that she must switch positions (sitting, standing, walking, reclining) throughout the day, that she is unable to stoop or crouch down at all, that her discomfort would impact her ability to maintain concentration and focus on work tasks, and that she felt she would be off task more than fifteen percent of a workday. [R102, 104-05, 115].

Plaintiff testified she did not do any household cleaning and that she could not do laundry but that if her spouse brought her a basket of laundry, she could fold it. [R94]. She stated that her niece did all the shopping. [R94]. She also reported that she did not visit family or friends and that they would instead come to visit her. [R94].

### C.   Administrative Records

Plaintiff had consistent earnings for the thirty-eight years prior to her original onset date, with earnings in every quarter since 1978 except two. [R265-66].

In a list of medications Plaintiff submitted to the Social Security Administration on January 30, 2018, she stated that she had been taking propranolol[9] since 2011 for high blood pressure and migraines; zolpidem[10] since

_____

[9]     Propranolol is in a class of medications called beta blockers. It commonly used to treat high blood pressure and to prevent migraine headaches.

12

March 2017 as a sleep aid; gabapentin[11] and hydrocodone[12] since September 2017 for back pain; naproxen[13] since September 2017 for knee inflammation; and diclofenac[14] since January 2018 for knee inflammation.  [R358].

### D.  Medical Records

On January 11, 2017, state agency consultant Ramana Reddy, M.D., reviewed the record, which included treatment notes from 2016 indicating hypertension, obesity, normal gait and strength, and complaints of bilateral knee

---

MedlinePlus, *Propranolol*, https://medlineplus.gov/druginfo/meds/a682607.html (last visited 9/11/2021).

[10]    Zolpidem is commonly sold under the brand name Ambien. MedlinePlus, *Zolpidem*, https://medlineplus.gov/druginfo/meds/a693025.html (last visited 9/11/2021).

[11]    Gabapentin is an anticonvulsant medication used to help relieve pain caused by nerve damage.  Mayo Clinic, *Anti-Seizure Medications: Relief from Nerve Pain*, https://www.mayoclinic.org/diseases-conditions/peripheral-neuropathy/in-depth/pain-medications/ART-20045004?p=1  (last visited 9/11/2021).

[12]    Hydrocodone is a narcotic analgesic medication used to relieve severe pain.  MedlinePlus, *Hydrocodone*, https://medlineplus.gov/druginfo/meds/a614045.html (last visited 9/11/2021).

[13]    Naproxen, also known by the brand name Aleve, is a nonsteroidal anti-inflammatory ("NSAID") drug used to relieve pain, tenderness, swelling, and stiffness.  MedlinePlus, *Naproxen*, https://medlineplus.gov/druginfo/meds/a681029.html (last visited 9/11/2021).

[14]    Diclofenac is an NSAID medication used to relieve mild to moderate pain.  MedlinePlus, *Diclofenac*, https://medlineplus.gov/druginfo/meds/a689002.html (last visited 9/11/2021).

pain, and x-rays from September and October 2016 showing diffuse moderate-to-severe degenerative joint disease of the knees, mild medial compartment narrowing of the right knee, narrowing and moderate spurring on the right patellofemoral compartment of the right knee, bilateral plantar heel spurs, and mild osteoarthritis of the left knee.  [R117-18, 121].  Dr. Reddy concluded that Plaintiff could perform a reduced range of light work, limited to standing for six hours; sitting for six hours; lifting twenty pounds occasionally and ten pounds frequently; occasionally climbing ramps, stairs, ladders, ropes, and scaffolds; frequently balancing; occasionally stooping, kneeling, crouching, or crawling; and no manipulative or environmental limitations.  [R120-21].

On January 31, 2017, Plaintiff saw Nitasha Burney, M.D.,[15] at Piedmont Healthcare for knee and back pain.  [R582].  The only abnormalities Dr. Burney noted were obesity, bilateral knee crepitus,[16] and tenderness to palpation at L4-L5 in Plaintiff's back.  [R583].

---

[15]    Dr. Burney specializes in family medicine.  Wellstar, *Nitasha Burney, M.D.*, (last visited 9/11/2021).

[16]     Crepitus refers to noise or vibration produced by rubbing bone or irregular cartilage surfaces together.  Crepitus, *PDR Med. Dictionary* (1st ed. 1995).

On February 20, 2017, Plaintiff was seen by Christopher A. Jarrett, M.D.,[17] at OrthoAtlanta for bilateral knee pain.  [R553, 556].  It was noted that over the past few years, Plaintiff had tried steroid injections, Supartz injections, [18] arthroscopic surgery, and physical therapy but that nothing had helped.  [R553].  On physical examination, it was noted that Plaintiff appeared obese and exhibited an antalgic gait,[19] swelling, tenderness, and limited range of motion in her knees.  [R555].  MRI scans of her knees taken that day revealed meniscus tears, severe cartilage loss, severe degenerative joint disease, and other abnormalities.

---

[17]   Dr. Jarrett is a board-certified orthopedic surgeon.  Piedmont Orthopedics, *Christopher A. Jarrett, M.D., OrthoAtlanta, Receives Prestigious Arthritis Foundation 2015 Hugh C. McLeod Award of Excellence*, https://www.orthoatlanta.com/media/christopher-a-jarrett-md-orthoatlanta-receives-prestigious-arthritis-foundation-2015-hugh-c-mcleod-award-of-excellence (last visited 9/13/2021).

[18]   Supartz injections are used to treat knee pain in patients with osteoarthritis.  The injected substance is similar to a substance that occurs naturally in the joints and may work by acting as a lubricant and shock absorber in the joint, helping the knee to move smoothly, thereby lessening pain.  WebMD, *Supartz Syringe*, https://www.webmd.com/drugs/2/drug-21749/supartz-intra-articular/details (last visited 9/11/2021).

[19]   An antalgic gait is a limp adopted so as to avoid bearing weight on the injured side of the body, thereby reducing pain.  The Free Online Medical Dictionary, *Antalgic Gait*, http://medical-dictionary.thefreedictionary.com/antalgic+gait (last visited 9/11/2021).

[R558-61].   Dr. Jarrett administered corticosteroid injections in both knees. [R555].

Plaintiff returned to Dr. Burney on March 9, 2017, this time with complaints of hip pain, along with continued back and knee pain.  [R588].  The only abnormalities Dr. Burney noted were obesity, bilateral knee crepitus, and tenderness to palpation in the back at L4-L5 and in the left hip.  [R589].

Frederick Wener, M.D., reviewed the evidence on March 24, 2017, and concluded that that Plaintiff could perform a reduced range of light work, limited to standing for four hours; sitting for six hours; lifting twenty pounds occasionally and ten pounds frequently; occasionally climbing ramps and stairs; never climbing ladders, ropes, or scaffolds; frequently balancing; occasionally stooping, kneeling, crouching, or crawling; and no manipulative or environmental limitations, except for the need to avoid concentrated exposure to hazards such as machinery and heights.  [R126-28, 130-35].

Plaintiff saw Dr. Burney again on March 30, 2017, for concerns regarding her weight.  [R606].  She also complained of bilateral knee pain and left-hip pain. [R606].  The only musculoskeletal finding Dr. Burney noted was that Plaintiff exhibited no edema.  [R606].

16

Plaintiff returned to Dr. Burney on April 27, 2017, again to discuss weight loss. [R610-11]. She also complained of bilateral knee pain and reported that she had been told that she had severe degenerative disc disease. [R611]. Again, the only musculoskeletal finding Dr. Burney noted was that Plaintiff exhibited no edema. [R611-12].

On August 16, 2017, Plaintiff saw Dr. Burney for new-onset abdominal pain. [R614-15]. Dr. Burney made no musculoskeletal findings. [R615-16].

On September 13, 2017, Plaintiff presented to Pickens A. Patterson, M.D., of Alliance Spine and Pain Management, for evaluation of back pain upon referral from Dr. Burney.[20] [R767]. Dr. Patterson noted that Plaintiff exhibited tenderness in her back, pain with lumbar extension, and an antalgic gait, but he found that she had normal curvature of the spine, normal strength and sensation, 2+ reflexes,[21] and no spasm or obvious deformities. [R768-69]. He started Plaintiff on acetaminophen-hydrocodone[22] and gabapentin. [R769].

---

[20] Dr. Patterson specializes in pain management and is board certified in pain medicine and anesthesiology. AllianceSpine, *Pickens A. Patterson III, MD*, https://spinepains.com/providers/pickens-a-patterson-iii-md/ (last visited 9/11/2021).

[21] Deep tendon reflexes are graded as follows: 0 = a tap elicits no response, which is always abnormal; 1+ = a tap elicits a slight but definitely present response, which may or may not be normal; 2+ = a tap elicits a brisk

On October 2, 2017, Plaintiff saw Zwade Marshall, M.D.,[23] at Alliance Spine, for imaging review and treatment of bilateral leg pain.   [R754]. Dr. Marshall found based on the imaging that Plaintiff had severe venous reflux, greater on the right side than the left.   [R754].   He recommended that she start wearing compression stockings for six to eight hours daily, elevate her legs, and perform modest exercise to improve her lower-extremity circulation.   [R754].

Plaintiff saw Dr. Patterson again on November 15, 2017, for management of low-back and leg pain.   [R747].   He noted that Plaintiff's cervical, thoracic, and lumbar spine had no obvious deformities, and he made no notations of

---

response, which is normal; 3+ = a tap elicits a very brisk response, which may or may not be normal; and 4+ = a tap elicits a repeating reflex, which is always abnormal.   H. Kenneth Walker, *Deep Tendon Reflexes Clinical Methods: The History, Physical, & Laboratory Examinations* (3d ed. 1990), *available at* http://www.ncbi.nlm.nih.gov/books/NBK396 (last visited 9/11/2021).

[22]   Acetaminophen and hydrocodone are sold as a pain-relieving narcotic combination medication commonly marketed under the brand names Vicodin, Lorcet, Lortab, and Norco.   MedlinePlus, *Hydrocodone Combination Products*, https://medlineplus.gov/druginfo/meds/a601006.html (last visited 9/12/2021).

[23]   Dr. Marshall is board certified in anesthesiology and pain management.   Piedmont Healthcare, *About Zwade J. Marshall*, https://doctors.piedmont.org/provider/Zwade+J+Marshall/388363 (last visited 9/12/2021).

significant abnormalities.  [R748-49].  He assessed spondylosis[24] of the lumbar and lumbosacral regions and administered a bilateral medial-branch nerve block.[25]  [R747-50].

Plaintiff returned to Dr. Burney on November 22, 2017, for hypertension, back pain, and knee pain.  [R626].  She reported that cortisone injections were no longer helping her knee pain.  [R626].  It was noted upon musculoskeletal examination that Plaintiff had crepitus in both knees and exhibited no edema. [R626-27].

On January 14, 2018, Plaintiff returned to Alliance Spine for follow-up and complaints of low-back pain.  [R735].  Physical examination revealed "tenderness to palpation bilateral lumbar facets [sic]," tenderness in the paraspinal muscles, pain with lumbar extension and bilateral flexion, straight-leg-raise test positive at

---

[24]    "Spondylosis" refers to stiffening vertebra and is "often applied nonspecifically to any lesion of the spine of a degenerative nature."  Spondylosis, *PDR Med. Dictionary* (1st ed. 1995).

[25]    A medial-branch nerve block is an injection of local anesthetic placed outside the joint space near the nerve that supplies the joint, which is called the medial branch.  The injection may or may not also include a steroid. Medial-branch blocks are typically ordered for patients who have pain primarily in their back coming from arthritic changes in the facet joints or mechanical low-back pain.  Brigham & Women's Hosp., *Facet & Medial Branch Blocks*, https://www.brighamandwomens.org/anesthesiology-and-pain-medicine/pain-management-center/facet-and-medial-branch-blocks (last visited 9/12/2021).

thirty degrees bilaterally, and knee tenderness present bilaterally along the medial joint line. [R737-38].

Plaintiff saw Dr. Patterson again on February 22, 2018, for follow-up of her bilateral low-back and knee pain. [R724]. Dr. Patterson observed that Plaintiff's cervical, thoracic, and lumbar spine had no obvious deformities, and he made no notations of significant abnormalities. [R727]. He assessed spondylosis without myelopathy or radiculopathy in the lumbar region and post-laminectomy syndrome[26]; noted that high-risk medication management would be continued; and refilled Plaintiff's prescription for acetaminophen-hydrocodone. [R727].

Dr. Patterson ordered an MRI of Plaintiff's lumbar spine, which was taken on March 2, 2018. [R774]. The MRI documented at L4-5, prior decompressive laminectomy with anterior and posterior fusion surgery and an osteophyte ridge projecting posteriorly and to the left mildly narrowing the left neural foramen; at L5-S1, loss of signal from the disc with a disc bulge mildly effacing the thecal sac

---

[26]    Post-laminectomy syndrome (also called "failed back syndrome") refers to the persistence of pain and disability following spinal surgery. Frequent causes include returning disc herniation, nerve-root compression, scar-tissue build-up (fibrosis), joint hypermobility, spinal instability, and facet joint problems. Pain that returns after back surgery may also arise because of systemic issues such as diabetes, autoimmune disorders, or peripheral vascular disease. Wake Spine & Pain, *Post-laminectomy Syndrome*, https://wakespine.com/knowledge-center/conditions-treated/post-laminectomy-syndrome/ (last visited 9/12/2021).

and S1 nerve roots and prominent bilateral facet hypertrophy, resulting in mild spinal stenosis as well as bilateral foraminal and lateral recess stenosis; and at L3-4, mild loss of signal from the disc with a minimal bulge and mild bilateral facet hypertrophy.  [R774-777].

Plaintiff was seen by Catherine A. Mauney, APRN, of Truffles Vein Specialists, on April 4, 2018, for pain and discomfort in both calves.  [R597]. Ms. Mauney ordered venous doppler imaging and recommended compression stockings, leg elevation, over-the-counter pain medication, mild exercise, and weight reduction.  [R599].  The venous study revealed marked reflux in both legs, and it was recommended Plaintiff undergo endovenous ablation.[27]  [R601].

On April 13, 2018, Plaintiff returned to Dr. Burney for treatment of bilateral knee pain.  [R633].  She reported that the right knee hurt more than the left.   [R633].   On examination, Dr. Burney noted that Plaintiff exhibited tenderness in her right elbow and both knees and swelling and crepitus in her left knee.   [R633-34].   However, Dr. Burney found that Plaintiff's right elbow exhibited normal range of motion, no swelling, no effusion, and no deformity; her

---

[27]     Endovenous ablation uses energy to burn and close varicose veins.  It is used to help ease symptoms such as pain, swelling, and irritation. RadiologyInfo.org, *Varicose Vein Treatment (Endovenous Ablation of Varicose Veins)* (last visited 9/12/2021).

right knee exhibited normal range of motion, no swelling, no effusion, no ecchymosis, no deformity, no laceration, no erythema, normal alignment, no bony tenderness, and normal meniscus; and her left knee exhibited normal range of motion, no effusion, no laceration, no erythema, normal alignment, no LCL laxity, no bony tenderness, normal meniscus, and no MCL laxity.  [R633].

Plaintiff returned to Ms. Mauney on April 17, 2018, with complaints of pain and discomfort in both calves.  [R593-96].   Radiofrequency ablation was ordered.  [R596].

Plaintiff underwent a spinal-cord-stimulator trial from April 18, 2018, through April 26, 2018, with Dr. Patterson.  [R704, 709-15].  Dr. Patterson noted that Plaintiff's cervical, thoracic, and lumbar spine had no obvious deformities, and he noted no significant abnormalities.  [R712].  Plaintiff reported seventy-five percent relief of her lumbar "radic pain"[28] during the trial and indicated that she was able to function much better.  [R704].

_____

[28]   This appears to reference pain emanating from the nerve roots in Plaintiff's lumbar spine.  *See* J.E. Schmidt, M.D., *Attorneys' Dictionary of Medicine, Illustrated* R-9 (46th ed. 2012) (explaining that "radicular" features pertain to, or involve, a root, especially the root of a spinal nerve).

Plaintiff saw orthopedist Arthur Raines, M.D.,[29] of Resurgens Orthopaedics, on April 24, 2018, upon referral from Dr. Burney for evaluation of Plaintiff's bilateral knee pain.  [R789-91].  Dr. Raines read x-rays of Plaintiff's knees to show bilateral compartment arthritis with severe patellofemoral arthritic changes and joint space narrowing of the left knee.  [R791].  Dr. Raines recommended bilateral total knee replacements, left first.  [R791].

Plaintiff saw Dr. Burney again on June 18, 2018.  [R637].  On examination, Dr. Burney merely observed that Plaintiff exhibited bilateral knee crepitus with no edema or tenderness, but she also noted that Plaintiff got some relief from back pain with a spinal-cord stimulator and would soon have a permanent stimulator placed, that Plaintiff would also receive pain management, and that she would have a left-knee placement with Dr. Raines as soon as he received clearance.  [R641-42].

On June 20, 2018, Dr. Patterson implanted a permanent spinal-cord stimulator.  [R694, 698-99].  Examination was unremarkable.  [R697].  At the

_____

[29]   Dr. Raines is a board-certified orthopedic surgeon.  Resurgens Orthopaedics, *Arthur L. Raines, M.D.*, https://www.resurgens.com/physicians/arthur-l-raines-md (last visited 9/13/2021).

23

time, Plaintiff's medications included propranolol, diclofenac sodium, Keflex,[30] acetaminophen-hydrocodone, and gabapentin, as well as Ambien and melatonin at bedtime.  [R697].

Dr. Burney completed a functional-limitation assessment on July 2, 2018. [R796-97].  Dr. Burney expressed that Plaintiff has been her patient for over six years and that she was very motivated to work but that due to her physical disabilities, she had been unable to do so.  [R797].  Specifically, Dr. Burney opined that Plaintiff could reasonably be expected to need to limit herself to three hours sitting, one hour standing, and one hour walking total in an eight-hour workday, with sitting limited to no more than four hours at one time and standing and walking each limited to no more than an hour at a time; to never lift any weight frequently; to lift up to twenty pounds occasionally; to reach and bend occasionally; and to never stoop or squat. [R796].  Dr. Burney further opined that Plaintiff would need the option to alternate sitting and standing every fifteen-to-twenty minutes; to lie down and rest every thirty minutes; to elevate her

---

[30]     Keflex (cephalexin) is an antibiotic medication.  It is used to treat bacterial infections and is also sometimes used for certain penicillin-allergic patients who have a heart condition and are having a dental or upper-respiratory-tract procedure, in order to prevent them from developing a heart-valve infection. MedlinePlus, *Cephalexin*,  https://medlineplus.gov/druginfo/meds/a682733.html (last visited 9/12/2021).

24

legs for an hour every one-to-two hours; and to take breaks every thirty minutes for fifteen minutes. [R796-97]. Dr. Burney additionally estimated that Plaintiff would be off-task due to pain and/or side-effects of medication at least twenty-five percent of the workday and would be absent from work ten or more days per month due to her impairments. [R797]. Dr. Burney explained that Plaintiff had "significant degenerative disc disease of her lumbar spine," which "not only causes severe back pain but also pain radiating down her legs," and that Plaintiff had "internal derangement of both knees and severe arthritis of her left knee." [R796].

Plaintiff was seen by Dr. Marshall on July 6, 2018, for bandage removal, wound care, and assessment of her low-back pain. [R674]. She reported back pain, knee pain, numbness, and tingling. [R676]. She was continued on acetaminophen-hydrocodone and Keflex, and her gabapentin was increased. [R677].

On August 3, 2018, Plaintiff saw Dr. Ross, a vascular surgeon at Piedmont Heart Institute Vein Care, with complaints of leg pain and varicose veins. [R778-87]. Dr. Ross noted that Plaintiff had been worked up for venous insufficiency at the Truffles clinic in April, that it had been recommended that she undergo radiofrequency ablation but that her insurance would not cover work

done at Truffles, and that he had reviewed the Truffles paperwork.   [R780]. Dr. Ross also noted that Plaintiff wore knee-high compression hose daily and reported that they helped some; that he had discussed with her the need for her to get a pair of thigh-high or pantyhose compression stockings; and that Plaintiff would begin calf-muscle exercises throughout the day and leg elevation above the head three times per day, use Aspercreme on phlebitic veins, [31] and avoid long-term sitting and standing.   [R780, 786].   Dr. Ross also observed that Plaintiff had "multiple arthritic issues" and degenerative changes in her back, had undergone previous right-hip replacement and lumbar fusion, was in need of bilateral knee replacement, and had a stimulator implanted in her back. [R780, 782-83].   Plaintiff was referred for a repeat bilateral venous duplex scan "for close evaluation of CVI."[32]   [R786].

Dr. Patterson completed a pain questionnaire on August 14, 2018. [R807-08].     He reported that he had seen Plaintiff monthly since

---

[31]     "Phlebitis" refers to inflammation of a vein.   Phlebitis, *PDR Med. Dictionary* (1st ed. 1995).

[32]     Chronic venous insufficiency ("CVI") is a condition in which the veins have problems sending blood from the legs back to the heart.   MedlinePlus, *Venous Insufficiency*, https://medlineplus.gov/ency/article/000203.htm (last visited 9/12/2021).

September 13, 2017, for lumbar radiculopathy[33] and low-back pain.  [R807].  He opined that Plaintiff's complaints of pain were reasonably consistent with her diagnosis and symptoms; that her pain resulted in her reasonably being unable to maintain attention and concentration fifteen percent of the day; that her pain prevented her from consistently performing a full eight-hour workday or forty-hour workweek; that her pain would result in her being absent from work an average of three days per month; and that on the days she attended, she was likely to be tardy or leave early due to pain an additional four days per month. [R807-08].

Plaintiff followed up with Dr. Patterson for treatment of low-back pain and bilateral knee pain on October 30, 2018.  [R827].  It was noted that physical therapy had failed and that NSAID medications were ineffective but that Plaintiff was receiving some short-term relief from home exercise and that opioid medications helped.  [R827-28].  Plaintiff's prescriptions included propranolol, Ambien, melatonin, diclofenac, Keflex, gabapentin, acetaminophen-hydrocodone, and compression stockings.  [R828-29].  It was noted that although her

---

[33]    "Radiculopathy" refers to a disorder of the spinal nerve roots. Radiculopathy, *PDR Med. Dictionary* (1st ed. 1995).

medication management was "high-risk," with use of opioids, her pain was well-controlled.  [R832].

Dr. Ross performed the endovenous ablation procedure on November 2, 2018.  [R834-39, 897-905].

Plaintiff returned to Dr. Burney on November 17, 2018, for follow-up of her chronic medical conditions.  [R856].  She reported sleep disturbance, continued bilateral knee pain, and back pain that was still present but improved with the stimulator implant.  [R856].  On examination, Dr. Burney noted that Plaintiff exhibited bilateral knee crepitus with no edema or tenderness. [R856-57].

Plaintiff saw Dr. Burney again on December 4, 2018, for preoperative clearance for a right-knee replacement.  [R865-66].  She complained of bilateral knee pain and continued pain across her back and down the back of her leg. [R865].  On physical examination, Dr. Burney noted that Plaintiff was obese and exhibited bilateral knee crepitus with no edema or tenderness and had a normal range of motion, reflexes, muscle tone, and coordination.  [R865-66].

28

On December 12, 2018, Plaintiff treated with Walter McClelland, Jr., M.D.,[34] for left-wrist and bilateral elbow pain. [R882-84]. It was noted that Dr. McClelland had performed surgery on Plaintiff's right wrist years earlier with good results. [R883]. Plaintiff reported that the wrist and hand problems had begun in May, that the elbow problems had begun in October, and that they consisted of constant aching, weakness, burning, and inability to lift, carry, push, or pull; that nothing alleviated the symptoms; and that the symptoms were more severe in the left wrist than the elbows. [R883]. On examination, there was tenderness and muscle weakness. [R883]. X-rays were positive, and Plaintiff was diagnosed with bilateral epicondylitis[35] and left-thumb arthritis. [R883-84]. She was prescribed elbow straps, braces, and medications, and a treatment plan

---

[34]    Dr. McClelland is a board-certified orthopedic surgeon with a certificate of added qualification in hand surgery. He specializes in hand, wrist, shoulder, and elbow surgery. Peachtree Orthopedics, *Walter B. McClelland, Jr., M.D.*,        https://www.peachtreeorthopedics.com/dr-walter-mcclelland.php (last visited 9/12/2021).

[35]    Epicondylitis is soreness or pain of the lower arm, near the elbow. *See* MedlinePlus, *Medial Epicondylitis – Golfer's Elbow*, https://medlineplus.gov/ency/article/007638.htm (last visited 9/12/2021) (referring to pain on the inside of the lower arm); MedlinePlus, *Tennis Elbow*, https://medlineplus.gov/ency/article/000449.htm (last visited 9/12/2021) (referring to pain on the outside of the lower arm).

was discussed for later hand therapy and injections after rehabilitation from knee surgery in case conservative treatment failed.  [R884].

Plaintiff returned to Alliance Spine on December 13, 2018, with complaints of increased pain, despite the spinal-cord stimulator, which she said died quickly, needed frequent charging, and mainly worked on her radicular pain.  [R848-52]. She reported that her pain was still at eight on a ten-point scale in her low back and knees.  [R848].  On examination, there was tenderness to palpation of the bilateral lumbar facets and pain with lumbar extension and bilateral flexion. [R851].  Plaintiff was advised that the spinal-cord stimulator could be adjusted for better coverage.  [R848].

Plaintiff had a total replacement of the right knee with Allen P. McDonald, III, M.D., at Peachtree Orthopedic Clinic on December 19, 2018. [R875-76].

Following the right-knee replacement surgery, Plaintiff was unable to walk and needed home health care and increased narcotic pain medications.  [R892-95]. She later progressed to a rolling walker and then a cane and started physical therapy twice a week.  [R892-95, 907-26].

As of February 13, 2019, Plaintiff was ambulating to physical therapy with a cane and was documented to have an antalgic gait.  [R908].  On examination,

30

Plaintiff's flexion, extension, and strength were all found to be reduced on the right.  [R908].  Although the left knee had full strength, it had zero degrees of extension and reduced flexion.  [R908].  It was noted that while Plaintiff was making progress, pain limited her activities, she had a decreased ability to ambulate or negotiate stairs, and she did not yet demonstrate the ability to manage balance on uneven surfaces or demonstrate a normal gait on uneven surfaces without an assistive device.  [R909-10].

On June 6, 2019, after the ALJ had issued the adverse decision, Dr. Patterson performed bilateral lumbar facet injections at L3/4 and L5/S1. [R40-47].

Dr. Patterson completed a second pain questionnaire on July 18, 2019. [R12-13].   He reported that he had seen Plaintiff monthly since September 13, 2017, for lumbar radiculopathy and low-back pain.  [R12].  He opined that Plaintiff's complaints of pain were reasonably consistent with her diagnosis and symptoms; that her pain resulted in her reasonably being unable to maintain attention and concentration twenty percent of the day; that her pain prevented her from consistently performing a full eight-hour workday or forty-hour workweek; that her pain would result in her being absent from work an

average of three days per month; and that on the days she attended, she was likely to be tardy or leave early due to pain an additional four days per month.  [R12-13].

On June 27, 2019, Plaintiff's insurance company approved coverage for two areas of "neurolysis facet nerve," defined as "[d]estruction of spinal joint nerves in the lower back with a chemical substance using imaging guidance or detailed pictures."  [R14].

On July 24, 2019, Dr. Patterson performed radiofrequency ablation on the right side of Plaintiff's low back at L3/4 and L5/S1, [R33-39], and on August 22, 2019, he performed radiofrequency ablation on the left side, [R26-32].

### E.  Vocational-Expert Testimony

At the hearing before the ALJ, a vocational expert ("VE") testified that Plaintiff had past relevant work as a volunteer coordinator/field director, DOT #187.167-022, sedentary, skilled, SVP 7; recreational leader, DOT #195.227-014, light as generally performed, sedentary as actually performed, skilled, SVP 6; customer-service representative, DOT #239.362-014, sedentary, skilled, SVP 5; and social-services aide, DOT #195.367-034, light as generally performed, sedentary as actually performed, skilled, SVP 6.  [R107-08]. When asked whether any of the past work involved transferable skills, the VE testified that Plaintiff's past work involved skills that would also allow for the

performance of the job of field director, DOT #195.167-022, sedentary, skilled, SVP 7, and camp director, DOT #195.167-018, sedentary, skilled, SVP 7. [R108-09].

The ALJ then asked about the working capability of a hypothetical person of Plaintiff's age, education, and work experience who was limited to light work, could only occasionally climb ramps and stairs; could never climb ladders, ropes or scaffolds; could frequently balance; could occasionally stoop, kneel, crouch, and crawl; could frequently be exposed to unprotected heights or dangerous moving machinery; and must be allowed to alternate between sitting for thirty minutes and standing for thirty minutes during an eight-hour workday. [R110]. The VE confirmed that the person could carry out all of Plaintiff's past work per the DOT and as performed and that the person could also perform unskilled work as a mail sorter, DOT #222.687-022; a storage-facility rental clerk, DOT #295.367-026; and a parking-lot attendant, DOT #915.473-010. [R110-11]. The VE also testified that if the individual needed a sit/stand option every fifteen minutes, there would be an inability to perform any past work or any other work because the postural changes would interfere too much with concentration, persistence, and pace. [R111-12]. Further, the VE testified that the person could not maintain any work if she were off-task for fifteen percent of the workday due

to pain or lapses in concentration or attention due to pain; if she were absent more than three days per month; if she needed thirty-minute breaks after every fifteen minutes of work; if she needed to elevate her legs at heart level every one-to-two hours for about an hour; or if she could sit for only three out of eight hours, stand for only one out of eight hours, and walk for only one out of eight hours. [R113-14].

## V.   ALJ'S FINDINGS

The ALJ made the following findings of fact and conclusions of law:

1.   The claimant meets the insured status requirements of the Social Security Act through December 31, 2021.

2.   The claimant has not engaged in substantial gainful activity since December 7, 2017, the amended alleged onset date (20 CFR 404.1571 et seq.).

3.   The claimant has the following severe impairments: degenerative disc disease of the lumbar spine, post laminectomy syndrome, chronic venous insufficiency, left and right knee arthroscopies, and obesity[] (20 CFR 404.1520(c)).

. . .

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

. . .

5.   After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional

capacity to perform light work as defined in 20 CFR 404.1567(b) except she should be allowed to alternate between sitting for 30 minutes and standing for 30 minutes during an eight-hour day.  She can occasionally climb ramps and stairs. She can never climb ladders, ropes, or scaffolds. She can frequently balance.  She can occasionally stoop, kneel, crouch, and crawl.  She can frequently be exposed to unprotected heights and dangerous, moving machinery.

. . .

6.   The claimant is capable of performing past relevant work as a volunteer coordinator (DOT# 187.167-022, sedentary, skilled, SVP 7), recreational leader (DOT# 195.227-014, light as generally performed, sedentary as actually performed, skilled, SVP 6), customer service representative (DOT# 239.362-014, sedentary, skilled, SVP 5), and social services aide (DOT# 195.367-034, light as generally performed, sedentary as actually performed, skilled, SVP 6).  This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

. . .

7.   The claimant has not been under a disability, as defined in the Social Security Act, from December 7, 2017, through the date of this decision (20 CFR 404.1520(f)).

[R67-72].

The ALJ explained that although she found that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, she found that Plaintiff's statements concerning the intensity, persistence, and limiting effects of the symptoms were not entirely consistent

35

with the medical evidence and other evidence in the record. [R69]. She based the determination on findings that Plaintiff's back was doing much better since the stimulator was implanted; that Plaintiff reported throughout the record that her medication made the pain tolerable; that Plaintiff's right knee was doing much better since the knee-replacement surgery and that there was no evidence that she would not make a full recovery; that the endovenous ablation of the left lower extremity appeared to have worked well with no adverse effects; and that numerous doctors had advised Plaintiff to lose weight to further alleviate her symptoms.

The ALJ also explained that in reviewing the opinion evidence, she gave "great weight" to the opinions of the state agency reviewing physicians Dr. Reddy and Dr. Wener, reasoning that the opinions were provided by experts with extensive experience assessing physical functional ability for Social Security disability programs; were based upon a thorough evaluation of all the evidence available as of the date of the assessments; and were supported by and consistent with the objective medical evidence, which included generally unremarkable physical examinations, imaging studies showing mostly mild-to-moderate changes, and relief of Plaintiff's symptoms with her medication regimen, implantation of a stimulator, and physical therapy following her right-knee

replacement. [R71]. The ALJ further explained that she gave no weight to the opinion of treating physician Dr. Patterson because it was inconsistent with the objective medical evidence and because Dr. Patterson "simply checked boxes on a form" and did not offer an explanation for the limitations stated in his opinion. [R71]. Finally, the ALJ explained that she gave no weight to the opinion of the other treating physician because she found the physician's handwriting on the opinion, including her name, to be mostly illegible; the physician offered no explanation for the extreme limitations in her opinion except to list off Plaintiff's impairments; the physician did not discuss Plaintiff's treatment or the improvements she saw with treatment; the multiple-choice options on the opinion form were leading; and the physician contradicted herself by opining that Plaintiff could sit for four hours at one time but could not sit for more than three hours total in an eight-hour day. [R71-72].

## VI. CLAIMS OF ERROR

Plaintiff raises numerous allegations of error. First, she argues that the ALJ improperly relied on the state-agency opinions that were issued prior to the amended alleged onset date and thus did not take into account the more recent evidence of Plaintiff's limitations. [Doc. 24 at 12-19]. Second, she maintains that the ALJ erred by rejecting the treating opinions without properly applying the

37

regulatory factors set out in 20 C.F.R. § 404.1520c.  [*Id*. at 19-27].  Third, she argues that the ALJ reversibly erred by failing to evaluate her symptoms according to SSR 16-3p.  [*Id*. at 27-33].  Fourth, she contends that new evidence submitted to the Appeals Council warrants remand.  [*Id*. at 33-34].

In response, the Commissioner contends that the ALJ properly considered the medical opinions and Plaintiff's subjective statements concerning the intensity, persistence, and functionally limiting effects of her impairments in assessing her RFC and that Plaintiff failed to show that evidence submitted to the Appeals Council rendered the ALJ's decision erroneous.   [Doc. 25 at 4-23].   The Commissioner points out that state agency consultants are highly qualified specialists who are also experts in the Social Security disability programs and that their opinions may be entitled to great weight if the evidence supports their opinions, which he argues is the case here:  although he concedes that Dr. Reddy and Dr. Wener did not examine Plaintiff or review all of the evidence, he contends that the ALJ properly found that the remaining evidence was generally consistent with their opinions, such as notes indicating that Plaintiff's knee surgery was successful, and that the ALJ accommodated additional limitations with the sit/stand option.  [*Id*. at 8-11].  The Commissioner further avers that the ALJ properly rejected the opinions of Dr. Burney and Dr. Patterson in assessing

Plaintiff's RFC because Dr. Burney and Dr. Patterson failed to provide acceptable explanations for their opinions or sufficient objective medical findings to support their opinions, since diagnoses do not in and of themselves establish work-related limitations; both doctors' objective findings were unremarkable; no other findings in the record reveal deterioration or significant abnormalities in Plaintiff's knees or back indicating that Plaintiff had the extreme limitations asserted in Dr. Burney's and Dr. Patterson's opinions; the record indicates that the spinal-cord stimulator implanted in June 2018 and the right-knee replacement surgery in December 2018, among other treatments, improved Plaintiff's condition; and the opinions of reviewing physicians Dr. Reddy and Dr. Wener also support the ALJ's decision to give no weight to the opinions of Dr. Burney and Dr. Patterson.   [*Id.* at 11-17].   With regard to the ALJ's evaluation of Plaintiff's subjective complaints, the Commissioner contends that although the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause her alleged symptoms, substantial evidence supports the ALJ's finding that Plaintiff's statements concerning the intensity, persistence, and limiting effects of the alleged pain and other symptoms were not entirely consistent with the medical evidence and other evidence in the record, particularly for a twelve-month period; the evidence upon which Plaintiff relies

does not undermine the substantial evidence supporting the ALJ's evaluation of her allegations of disabling pain and other symptoms; and the ALJ was not required to specifically refer every piece of evidence in the decision. [*Id*. at 17-20].  The Commissioner additionally maintains that Plaintiff failed to meet her burden of proving that she could not perform her past relevant work. [*Id*. at 20].  Finally, the Commissioner argues that Plaintiff failed to show that evidence submitted to the Appeals Council rendered the ALJ's decision erroneous, since the medical records submitted to the Appeals Council were all from after the ALJ's decision; Dr. Patterson's July 2019 opinion was essentially a duplicate of his August 2018 opinion, which had been before the ALJ and was properly discredited; and there had been no showing that the post-decision medical records or Dr. Patterson's July 2019 opinion was relevant to the time period at issue. [*Id*. at 21-23].

Following careful review, the undersigned finds that Plaintiff has indeed shown that the ALJ committed reversible error.  At the heart of the matter is the absence of any non-stale medical opinion that supports the RFC.

The Commissioner evaluates every medical opinion the agency receives, regardless of the source.  20 C.F.R. § 404.1527(c); *cf*. 20 C.F.R. § 404.1527(b) ("In determining whether you are disabled, we will always consider the medical

opinions in your case record together with the rest of the relevant evidence we receive."); SSR 06-03p, 2006 WL 2329939 at *4 ("[T]he [Social Security] Act requires us to consider all of the available evidence in the individual's case record in every case.").[36]   Thus, both examining and non-examining sources provide opinion evidence for the ALJ to consider in rendering a decision. 20 C.F.R. § 404.1527(c), (e).   In determining the weight of medical opinions, the ALJ must consider: (1) the examining relationship; (2) the treatment relationship; (3) evidence supporting the conclusions; (4) the consistency of the opinion with the record as a whole; (5) the medical expert's area of specialty; and (6) other factors, including the amount of understanding of disability programs and the familiarity of the medical source with information in the claimant's case record. 20 C.F.R. § 404.1527(c)(1)-(6).

The relationship between the claimant and the provider is particularly important.   The ALJ must assign controlling weight to the opinion of a treating

---

[36]     Although Plaintiff cites 20 C.F.R. § 404.1520c (2017), [Doc. 24 at 19], and 20 C.F.R. § 404.1527 has been superseded, § 404.1527 remains applicable to cases such as Plaintiff's that were filed prior to March 27, 2017.  20 C.F.R. § 404.1527 (2017).  While SSR 06-03p has also been rescinded, it likewise remains applicable to cases filed before March 27, 2017. Corr. Not. of Rescission of Soc. Sec. Rulings, 96-2p, 96-5p, & 06-03p, 2017 WL 3928297 (Apr. 6, 2017); Not. of Rescission of Soc. Sec. Rulings, 96-2p, 96-5p, & 06-03p, 2017 WL 3928298 (Mar. 27, 2017).

physician unless she supplies good cause for assigning the opinion less weight. 20 C.F.R. § 404.1527(c).  "Good cause exists when (1) the treating physician's opinion was not bolstered by the evidence, (2) the evidence supported a contrary finding, or (3) the treating physician's opinion was conclusory or inconsistent with his or her own medical records."  *Schink v. Comm'r of Soc. Sec.*, 935 F.3d 1245, 1259 (11th Cir. 2019).  Failure to clearly articulate good cause for discounting the weight of a treating opinion constitutes reversible error. *Id*.  "The opinions of nonexamining, reviewing physicians, when contrary to the opinion of a treating or examining opinion, are entitled to little weight and do not, 'taken alone, constitute substantial evidence.' "  *Gray v. Comm'r of Soc. Sec.*, 550 Fed. Appx. 850, 854 (11th Cir. Dec. 30, 2013) (citing *Sharfarz v. Bowen*, 825 F.2d 278, 280 (11th Cir. 1987); *Broughton v. Heckler*, 776 F.2d 960, 962 (11th Cir. 1985)).  "Of course, the ALJ may reject any medical opinion if the evidence supports a contrary finding." *Sharfarz*, 825 F.2d at 280.

The Court is persuaded by Plaintiff's argument that the ALJ reversibly erred by relying on state-agency reviewing opinions that were issued prior to the onset date.  It is undisputed that Dr. Reddy and Dr. Wener did not review any evidence postdating March 24, 2017.  [*See* Doc. 25 at 9].  Be that as it may, as Defendant aptly points out, the lack of a complete review does not alone

42

constitute reversible error, as Eleventh Circuit panels have held that an ALJ may rely on a reviewing opinion that is based on less than a full examination of the record where the reviewer cited portions of the record in support of his conclusions, the ALJ had access to the entire record, and the later-received evidence did not provide any new or material information that would alter the reviewer's findings about the claimant's functional limitations. *See, e.g.*, *Putman v. Soc. Sec. Admin., Comm'r*, 705 Fed. Appx. 929, 934 (11th Cir. Sept. 18, 2017); *Stultz v. Comm'r of Soc. Sec.*, 628 Fed. Appx. 665, 669 (11th Cir. Oct. 7, 2015). In the present case, however, the record evidence received after the agency consultants reviewed the record and provided their opinions does, in fact, contain new and material information lending greater support to Plaintiff's claims of limitation than the evidence that was available to the agency reviewers.  These later-received records include October 2017 imaging indicating that Plaintiff had severe venous reflux, [R754]; a treating physician's November 2017 diagnosis of spondylosis of the lumbar and lumbosacral regions and administration of a medial-branch nerve block, [R747-50]; November 2017 treatment notes indicating that cortisone injections were no longer helping Plaintiff's knee pain, [R626]; January 2018 examination notes indicating tenderness to palpation of the bilateral lumbar facet area, tenderness in the paraspinal muscles, pain with lumbar

43

extension and bilateral flexion, a straight-leg raise test positive at thirty degrees bilaterally, and knee tenderness present bilaterally along the medial joint line, [R737-38]; a treating physician's February 2018 diagnosis of post-laminectomy syndrome, [R727]; notes from 2018 and late 2017 indicating that Plaintiff was under supervision for narcotic medication of her pain, [R727, 746]; results of a March 2018 lumbar MRI showing an osteophyte ridge projecting posteriorly and to the left, among other abnormalities, [R774-77]; April 2018 treatment notes indicating that imaging revealed marked venous reflux in both legs and that endovenous ablation was recommended, [R596, 601]; April 2018 treatment notes indicating that Plaintiff exhibited tenderness in her right elbow, [R633-34]; April and June 2018 treatment notes indicating that spinal-nerve pain was significant enough to warrant implantation of a spinal-cord stimulator, [R694, 697-99, 704, 709-15]; April 2018 x-rays revealing bilateral compartment arthritis with severe patellofemoral arthritic changes and joint-space narrowing of the left knee and a treatment note recommending bilateral total knee replacements, left first, [R791]; July 2018 treatment notes indicating that after Plaintiff received the spinal-cord stimulator, she still complained of back pain, knee pain, numbness, and tingling, she was continued on acetaminophen-hydrocodone, and her gabapentin was increased, [R676-77]; a vascular surgeon's August 2018

44

recommendation to Plaintiff to elevate her legs above her head three times per day and avoid long-term sitting and standing, [R780, 786]; October 2018 treatment notes indicating that physical therapy had failed, that NSAID medications were ineffective, and that Plaintiff's pain was controlled only via the use of "high-risk" opioid medications, [R827-29, 832]; November 2018 treatment notes indicating that Plaintiff underwent endovenous ablation, [R834-39, 897-905]; an orthopedic surgeon's December 2018 treatment notes observing tenderness and weakness in the arms, remarking on positive x-rays, and diagnosing bilateral epicondylitis and left-thumb arthritis, [R883]; December 2018 examination notes indicating that Plaintiff still had tenderness to palpation of the bilateral lumbar facets and pain with lumbar extension and bilateral flexion, [R848-52]; December 2018 treatment notes indicating that Plaintiff had a total replacement of her right knee, [R875-76]; February 2019 physical therapy notes documenting that Plaintiff had an antalgic gait and reduced extension and flexion in both knees, had a decreased ability to ambulate or negotiate stairs, and did not yet demonstrate the ability to manage balance on uneven surfaces or demonstrate a normal gait on uneven surfaces without an assistive device, [R908-10]; and opinions of treating physicians that Plaintiff had disabling limitations, [R796-97, 807-08]. An ALJ cannot make up for a lack of a

valid medical opinion by reviewing raw medical records herself. *See Combs v. Berryhill*, 878 F.3d 642, 647 (8th Cir. 2017) (holding that "[b]y relying on his own interpretation of what 'no acute distress' and 'normal movement in all extremities' meant in terms of [the claimant's] RFC, the ALJ failed to satisfy his duty to fully and fairly develop the record"); *Ybarra v. Comm'r of Soc. Sec.*, 658 Fed. Appx. 538, 543 (11th Cir. Sept. 29, 2016) ("[A]n 'ALJ may not make medical findings herself.' "); *Rease v. Barnhart*, 422 F. Supp. 2d 1334, 1374 (N.D. Ga. 2006) ("The ALJ cannot act as both judge and physician."); *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999) ("As a lay person, . . . the ALJ was simply not qualified to interpret raw medical data in functional terms."); *Deskin v. Comm'r of Soc. Sec.*, 605 F. Supp. 2d 908, 912 (N.D. Ohio 2008) ("In making the residual functional capacity finding, the ALJ may not interpret raw medical data in functional terms."); *Rohrberg v. Apfel*, 26 F. Supp. 2d 303, 311 (D. Mass. 1998) ("An ALJ is not qualified to assess a claimant's RFC on the basis of bare medical findings."); *cf. Marbury v. Sullivan*, 957 F.2d 837, 840-41 (11th Cir. 1992) (Johnson, J., concurring) ("[A] hearing officer may not arbitrarily substitute his own hunch or intuition for the diagnoses of a medical professional."); *Hillsman*, 804 F.2d at 1182 (explaining that the Commissioner may not reject the opinion of a treating physician simply because the ALJ

46

"reached a different conclusion after viewing the medical records"); *Graham v. Bowen*, 786 F.2d 1113, 1115 (11th Cir. 1986) (holding that the ALJ improperly substituted his conclusion that the claimant "appeared moderately handicapped in her gait" for the medical evidence of record).  Given the copious evidence of unresolved impairments, continued pain, and continued need for and use of "high-risk" narcotic medication, it is certainly beyond the capacity of a layperson such as the ALJ—or for that matter, the undersigned—to determine that Plaintiff's limitations were not materially greater than those suggested by the evidence available to the reviewing physicians.[37]  Thus, the opinions of Dr. Reddy and Dr. Wener were based on materially incomplete data and therefore cannot amount to substantial evidence sufficient to support the RFC.

Even if the ALJ were permitted to interpret raw medical evidence, the decision reveals an impermissibly skewed review of the record.  While an ALJ need not refer to every piece of evidence in the record, she must demonstrate a full and fair review of the record and show that she considered all of the

---

[37]     It does not in fact appear unlikely that proper review of the evidence may result in a determination that Plaintiff's pain and medication would have, at least for a closed period of at least twelve months, caused her to be off-task at least fifteen percent of a typical workday, which the VE testified would preclude all work.  [R113].

evidence—both favorable and unfavorable to her opinion.  *See Henry v. Comm'r of Soc. Sec.*, 802 F.3d 1264, 1269-70 (11th Cir. 2015) (reversing and remanding for further consideration of the record where the ALJ's decision "neither explicitly nor implicitly alluded to [the claimant's] vision limitations"); *McCruter v. Bowen*, 791 F.2d 1544, 1548 (11th Cir. 1986) (holding that an administrative decision is not supported by "substantial evidence" where the ALJ acknowledges only the evidence favorable to the decision and disregards contrary evidence). For instance, by failing to acknowledge that Dr. Burney had authored one of the medical opinions, the ALJ necessarily omitted from her evaluation of the opinion any consideration of Dr. Burney's extensive history treating Plaintiff and managing her specialized care.[38]  [*Compare* R71 *with* R381-84, 559, 561, 581-90, 604-48, 668, 674, 678, 684, 686, 692, 694, 696, 702, 704, 706, 709-11, 717, 719-20, 724, 726, 729, 735, 737, 740, 744, 748, 752, 754, 760, 764, 767, 768, 780, 784, 786-87, 791, 796-97, 800, 818-20, 822-23, 825, 829, 845, 848, 855-57, 859,

_____

[38]     The Court also finds disingenuous the ALJ's reasoning that Dr. Burney's opinion should be accorded no weight, in part, because the handwriting on the opinion was so illegible that the ALJ could not identify the author.  [*Compare* R71 with R797].  The physician's name was printed above the signature clearly enough to make out that the signature was Dr. Burney's. [*See* R797].  Also, despite allegedly being unable to discern the identity of the author of the opinion, the ALJ was somehow able to identify that the author of the opinion was female.  [*See* R71-72].

863, 865-67]. Similarly, while the ALJ states that Plaintiff "reported throughout the record" that her medication regimen made her overall pain tolerable, particularly in combination with the spinal-cord stimulator, [R71 (citing [R745])], she ignores that the regimen depended on "high-risk" narcotic medications, [R745-46, 827-29, 832], and that Plaintiff's need for the medication actually increased after the implantation of the spinal stimulator, [R677, 827-29, 832, 848]. Likewise, while the ALJ accurately observed that Plaintiff showed improvement with physical therapy following her right-knee replacement, physical therapy notes show that as late as February 2019 (more than a year after the alleged onset date), Plaintiff still had an antalgic gait, reduced extension and flexion in both knees, and decreased ability to ambulate or negotiate stairs, and she did not yet demonstrate the ability to manage balance on uneven surfaces or demonstrate a normal gait on uneven surfaces without an assistive device. [R908-10]. There is also nothing in the record suggesting that Plaintiff has attained sufficient stability to undergo the recommended surgery to replace her severely compromised left knee or that the sit/stand option included in the RFC is sufficient to accommodate the limitations caused by the unrepaired left knee. [R791]. The ALJ also disregards Plaintiff's complaints of elbow and wrist pain, positive x-rays, and diagnosis of bilateral epicondylitis and left-thumb arthritis, [R633-34, 883-84].

49

The ALJ's reliance on "generally unremarkable physical exams" as evidence that Plaintiff's claims of limitation are overstated is additionally undermined by Plaintiff's treatment record: the need for multiple surgeries, the need for nerve-block injections and a spinal stimulator, and the continued reliance on narcotic pain medications. [*Compare* R71 *with* R596, 677, 694, 697-99, 727, 747-50, 769, 791, 832, 834-39, 875-76, 892-95, 897-905, 907-26]. Moreover, the post-hearing medical evidence submitted to the Appeals Council bolsters Plaintiff's claims of continued back pain, as they show that she received bilateral lumbar facet injections at L3/4 and L5/S1 within two months of the ALJ's adverse decision, [*compare* R73 *with* R40-47]; received approval from her insurance company for ablation—i.e., destruction—of those nerves just a couple of weeks later, [R14]; and underwent the ablation procedures within the following two months, [R26-39]. For all of these same reasons, the ALJ's decision to reject the opinions of the treating physicians due to "unremarkable physical exams" and evidence of improvement in her symptoms is not supported by substantial evidence. [*See* R71].

Accordingly, the undersigned concludes that the decision of the Commissioner must be reversed and remanded for further consideration of the evidence. Because the ALJ erred in her consideration of the medical evidence

and opinions, it will also be necessary for Plaintiff's statements of symptoms to be re-evaluated upon remand. *See* SSR 16-3p, 2017 WL 5180304, at *5-8 (providing that in evaluating a claimant's statement of symptoms, the ALJ must consider the objective medical evidence; diagnoses, prognoses, opinions, statements, and medical reports from medical sources; the claimant's activities of daily living; the location, duration, frequency, and intensity of the claimant's symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of medication; other treatment or measures taken in pursuit of symptom relief; and any other factors concerning functional limitations or restrictions caused by the claimant's symptoms).

## VII.   CONCLUSION

In conclusion, the Court **REVERSES** the final decision of the Commissioner and **REMANDS** the case for further proceedings consistent with this opinion.

The Clerk is **DIRECTED** to enter final judgment in favor of Plaintiff.

**IT IS SO ORDERED and DIRECTED**, this 13th day of September, 2021.

ALAN J. BAVERMAN
UNITED STATES MAGISTRATE JUDGE

51